GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
ARIEL A. NEUMAN (Cal. State Bar No.: 241594)
JUSTIN RHOADES (Cal. State Bar No.: 230463)
JEFF MITCHELL (Cal. State Bar No.: 236225)
Assistant United States Attorneys
Violent & Organized Crime Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2917/3380/0698
    Facsimile: (213) 894-3713
    E-mail: ariel.neuman@usdoj.gov
           justin.rhoades@usdoj.gov
           jeff.mitchell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>RAMON NARCISO MORALES MENDOZA, et al.,<br><br>           Defendants. | No. CR 09-230(A)-SVW<br><br>OPPOSITION TO DEFENDANT GLENN ITO'S MOTION TO SUPPRESS EVIDENCE; DECLARATIONS OF JAIME ORTEGA, MARK CARRILLO, JOHN DEBETS, MANUEL GARZA, STEPHEN SHARPE, AND ARIEL A. NEUMAN<br><br>Hearing: March 17, 2010 |

Plaintiff United States of America, through its counsel of record, the United States Attorney for the Central District of California, hereby files its Opposition to defendant Glenn Ito's motion to suppress evidence and requests that the Court deny the motion without an evidentiary hearing.

The United States' Opposition is based on the attached memorandum of points and authorities, the declarations of Jaime Ortega, Mark Carrillo, John Debets, Manuel Garza, Stephen Sharpe,

and Ariel A. Neuman, the attachments and exhibits to those declarations, the files and records in this case, and any additional argument or evidence that the United States may present at a hearing on this matter.

Dated: February 12, 2010

        Respectfully submitted,

        GEORGE S. CARDONA
        Acting United States Attorney

        CHRISTINE C. EWELL
        Assistant United States Attorney
        Chief, Criminal Division

        _____
        ARIEL A. NEUMAN
        JUSTIN RHOADES
        JEFF MITCHELL
        Assistant United States Attorneys

        Attorneys for Plaintiff
        United States of America

# TABLE OF CONTENTS
|  | PAGE(S) |
|---|---|
| TABLE OF AUTHORITIES | ii |
| I. INTRODUCTION | 1 |
|    A. Procedural History | 1 |
|    B. Summary of Facts | 1 |
| II. ARGUMENT | 6 |
|    A. The Investigatory Traffic Stop of Defendant Was Valid | 6 |
|    B. The Safety Pat-Down of Defendant and Seizure of Heroin From Defendant's Person Were Lawful | 8 |
|    C. The Results of the Search Were Subject to Inevitable Discovery | 12 |
| III. CONCLUSION | 15 |

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

Brett v. United States,
    412 F.2d 401 (5th Cir. 1969) . . . . . . . . . . . . . 12

Minnesota v. Dickerson,
    508 U.S. 366 (1993) . . . . . . . . . . . . . . . . . . 8

Moody v. United States,
    376 F.2d 525 (9th Cir. 1967) . . . . . . . . . . . . . 12

Nix v. Williams,
    467 U.S. 431 (1984) . . . . . . . . . . . . . . . . . . 13

Sibron v. New York,
    392 U.S. 40 (1968) . . . . . . . . . . . . . . . . 13, 14

Terry v. Ohio,
    392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . 7

United States v. $109,179 in U.S. Currency,
    228 F.3d 1080 (9th Cir. 2000) . . . . . . . . . . . . . 9

United States v. $124,570 U.S. Currency,
    873 F.2d 1240 (9th Cir. 1989) . . . . . . . . . . . . 11

United States v. Andrade,
    784 F.2d 1431 (9th Cir. 1986) . . . . . . . . . . . . 13

United States v. Bertrand,
    926 F.2d 838 (9th Cir. 1991) . . . . . . . . . . . . 9, 14

United States v. Boatwright,
    822 F.2d 862 (9th Cir. 1987) . . . . . . . . . . . . . 13

United States v. Carrillo-Espinola,
    1989 WL 140650 (9th Cir. 1989) . . . . . . . . . . . . 11

United States v. Garza,
    980 F.2d 546 (9th Cir. 1992) . . . . . . . . . . . . . 8

United States v. Gonzalez,
    700 F.2d 196 (5th Cir. 1976) . . . . . . . . . . . . . 12

United States v. Greenberg,
    320 F.2d 467 (9th Cir. 1963) . . . . . . . . . . . . . 8

United States v. Hall,
    543 F.2d 1229 (9th Cir. 1976) . . . . . . . . . . . . 11

United States v. Leverette,
    503 F.2d 269 (9th Cir. 1974) . . . . . . . . . . . . . 11

TABLE OF AUTHORITIES (cont.d)

PAGE(S)

United States v. Lopez-Soto,
    205 F.3d 1101 (9th Cir. 2000) . . . . . . . . . . . . . . . 7

United States v. Lugo,
    170 F.3d 996 (10th Cir. 1999) . . . . . . . . . . . . . . . 11

United States v. Martinez-Gallegos,
    807 F.2d 868 (9th Cir. 1987) . . . . . . . . . . . . . . . 13

United States v. Merriweather,
    777 F.2d 503 (9th Cir. 1985) . . . . . . . . . . . . . . 12-13

United States v. Montes-Reyes,
    547 F. Supp. 2d 281 (S.D.N.Y. 2008) . . . . . . . . . . . 11

United States v. Palos-Marquez,
    2010 WL 157476 (9th Cir. 2010) . . . . . . . . . . . . . . 7

United States v. Robinson,
    414 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . 14

United States v. Sanchez-Lopez,
    879 F.2d 541 (9th Cir. 1989) . . . . . . . . . . . . . . . 11

United States v. Sokolow,
    490 U.S. 1 (1989) . . . . . . . . . . . . . . . . . . . . . 7

United States v. Todhunter,
    297 F.3d 886 (9th Cir. 2002) . . . . . . . . . . . . . . . 9

United States v. Uriostegui-Estrada,
    86 F.3d 87 (7th Cir. 1996) . . . . . . . . . . . . . . . . 11

Virginia v. Moore,
    128 S. Ct. 1598 (2008) . . . . . . . . . . . . . . . . . . 14

Washington v. McDonald,
    2009 WL 2043058 (E.D. Cal. 2009) . . . . . . . . . . . . . 11

**FEDERAL STATUTES**

21 U.S.C. § 843(b) . . . . . . . . . . . . . . . . . . . . . . 13

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . 1, 13

**FEDERAL RULES**

Fed. R. Crim. Proc. 3 . . . . . . . . . . . . . . . . . . . . . 8


# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

### A. Procedural History

On April 9, 2009, defendant Glenn Ito ("defendant") and 51 co-defendants were charged in a First Superseding Indictment with various narcotics violations related to heroin trafficking in the Los Angeles area by the Mendoza Family heroin distribution organization. Defendant is charged in Count One of the First Superseding Indictment with a violation of 21 U.S.C. § 846: conspiracy to distribute more than one kilogram of heroin. Following stipulations by the parties, the trial date was continued to April 13, 2010. On February 1, 2010, defendant filed a motion to suppress the following evidence:
1) approximately 17.65 grams of heroin packaged in 72 balloons found on defendant's person on January 27, 2009, and
2) <u>Mirandized</u> statements made to detectives following defendant's arrest on that date.

### B. Summary of Facts

In the fall of 2008, the Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Area ("HIDTA") Group 46, together with the Los Angeles County Sheriff Department ("LASD") Gang and Narcotics Enforcement Team ("GANET"), began an investigation into the heroin trafficking activities of a large-scale heroin distribution organization operating in East Los Angeles and the surrounding areas. Declaration of Ariel A. Neuman ("Neuman Decl.") ¶ 2. The investigation involved the use of federally-authorized wiretaps, surveillance, and seizures of

1  heroin, among other investigative techniques.  Id.  During the
2  course of the investigation, law enforcement intercepted numerous
3  calls between members of the organization and an individual
4  identified as "Japo," later determined to be defendant.  Id.
5       On January 27, 2009, intercepted calls indicated that a
6  known runner for the organization, identified at the time as "Tio
7  Rocquis" (now known to be co-defendant Margarito Lopez Cuevas),
8  would be meeting "Japo" at the parking lot of a specific "99
9  Cent" store to deliver heroin for "Japo" to distribute.
10 Declaration of LASD Deputy Jaime Ortega ("Ortega Decl.") ¶ 5;
11 Declaration of LASD Deputy Mark Carrillo ("Carrillo Decl.") ¶ 4.
12 Law enforcement established a presence in the area so as to
13 conduct surveillance of the transaction, identify the
14 participants, and seize any heroin.  Ortega Decl. ¶¶ 4, 5, 6;
15 Carrillo Decl. ¶¶ 3, 4, 5.
16      Shortly after 11:30 a.m., with LASD detectives watching, the
17 heroin transaction occurred.  Ortega Decl. ¶ 6; Carrillo Decl.
18 ¶ 5.  Deputies Jaime Ortega and Mark Carrillo, stationed in the
19 vicinity in their marked patrol vehicle, listened as the lead
20 investigator, LASD Detective Joseph Carrillo, and others,
21 described via radio transmission their observations of what they
22 believed to be a heroin transaction occurring between two
23 individuals inside a white Toyota RAV-4 model sport utility
24 vehicle in the parking lot of the "99 Cents" Store.  Ortega Decl.
25 ¶ 6; Carrillo Decl. ¶ 5.  Detective Joseph Carrillo described in
26 detail the vehicle and described the driver, later determined to
27 be Glenn Ito, as one of the individuals engaged in the
28 transaction.  Ortega Decl. ¶ 6; Carrillo Decl. ¶ 5.

2

1  Deputies Ortega and Mark Carillo listened over the radio as
2  Detective Joseph Carrillo then advised that the RAV-4 was
3  leaving the parking lot, first turning north on Workman Avenue
4  and then west (left) onto North Broadway Boulevard.  Ortega Decl.
5  ¶ 7; Carrillo Decl. ¶ 6.  Detective Joseph Carrillo advised that
6  the RAV-4 was switching lanes repeatedly without signaling in an
7  apparent effort to get around the heavy traffic on North Broadway
8  Boulevard.  Id.  Detective Joseph Carrillo directed Deputies
9  Ortega and Mark Carrillo to conduct an investigatory traffic stop
10 of the RAV-4.  Id.

11     The deputies drove onto North Broadway Boulevard and saw the
12 RAV-4 driving west.  Ortega Decl. ¶ 8; Carrillo Decl. ¶ 7.  They
13 observed the RAV-4 switch lanes without signaling in what
14 appeared to be an effort to get around the traffic on North
15 Broadway Boulevard.[1]  Id.  Shortly before the freeway on-ramp
16 which leads to the South Interstate 5 (which is on the left side
17 of Broadway Boulevard), Deputies Ortega and Mark Carrillo watched
18 the RAV-4 pull from the right lane of North Broadway Boulevard
19 (the "number 2 lane") into the left lane (the "number 1 lane"),
20 and then proceed into the left turn lane — so as to turn onto the
21 on-ramp – without signaling.  Ortega Decl. ¶ 9; Carrillo Decl.

---

[1] The majority of this section of North Broadway Boulevard, that is, between Workman Avenue and the ramps to the Interstate 5 Freeway, is a busy thoroughfare with two lanes plus a parking lane in either direction, many stores and pedestrians on both sides of the street, and vehicles making left and right turns, and parallel parking, from one of the two lanes (and in the process slowing the flow of traffic).  Ortega Decl. ¶ 8.  There are approximately five city blocks between Workman Avenue and the ramps to the Interstate 5 Freeway, more than enough space for the RAV-4 in this case to make several lane changes in an apparent effort to get around the traffic.  Id. ¶ 8.

¶ 8. Deputy Ortega initiated the traffic stop by turning on their patrol vehicle lights. Id.

The RAV-4 pulled over to the right side of the on-ramp. Ortega Decl. ¶ 10; Carrillo Decl. ¶ 9. Deputy Ortega pulled the patrol vehicle behind the RAV-4 and got out of the patrol vehicle on the driver's side, while Deputy Mark Carrillo got out of the passenger's side. Id. Deputy Ortega approached the RAV-4 on the driver's side and Deputy Mark Carrillo approached on the passenger side. Id.

Deputy Ortega asked the driver to produce his license, registration, and proof of insurance, which the driver did and which allowed Deputy Ortega to identify the driver as defendant. Ortega Decl. ¶ 11. While standing by the open driver's side window, Deputy Ortega smelled and recognized the distinctive, vinegar-like odor of heroin coming from the vehicle. Id. Black tar heroin, such as that which defendant was carrying, has a strong, distinctive odor which Deputy Ortega recognized based on his prior experiences where he had smelled heroin. Id. ¶¶ 3, 11; Declaration of Detective John Debets ("Debets Decl.") ¶¶ 3, 4; Declaration of Senior Criminalist Manuel Garza ("Garza Decl.") ¶¶ 4, 5; Declaration of Corporal Stephen Sharpe ("Sharpe Decl.") ¶ 4. Having been informed by members of the surveillance team that defendant had been involved in a suspected heroin transaction, and having smelled the odor of heroin coming from the car, Deputy Ortega asked defendant to exit the RAV-4. Ortega Decl. ¶ 11; Carrillo Decl. ¶ 9.

Deputy Ortega then told defendant that he was going to conduct a safety pat-down of his person for the deputies' safety.

4

Ortega Decl. ¶ 12. When asked whether he had anything illegal on his person, defendant did not audibly respond. Id. Deputy Ortega then conducted the safety pat-down of defendant as he was trained by LASD and as he has done with all suspects during his more than 10 years as a law enforcement officer: he had defendant interlace the fingers of his two hands behind his back, held the interlaced hands in his left hand, and used his right hand to pat defendant down. Ortega Decl. ¶ 12; Carrillo Decl. ¶ 10. Deputy Mark Carrillo came around the RAV-4 as Deputy Ortega began the safety pat-down so as to assist if necessary. Ortega Decl. ¶ 12; Carrillo Decl. ¶ 10.

While conducting the safety pat-down, Deputy Ortega felt a bulge in defendant's vest pocket which he describes as feeling "like a beanbag." Ortega Decl. ¶ 13. He again asked defendant whether defendant had anything illegal on his person, and at that point defendant stated that the bulge was in fact heroin. Id.

Deputy Ortega retrieved three clear, plastic baggies containing heroin-filled balloons from defendant's vest pocket and handed them to Deputy Mark Carrillo. Ortega Decl. ¶ 13; Carrillo Decl. ¶ 11. He then completed the safety pat-down, immediately hand-cuffed defendant, and placed defendant in the backseat of the patrol vehicle. Ortega Decl. ¶ 13.

While this was happening, lead LASD detective Joseph Carrillo was watching the traffic stop from across the freeway. Carrillo Decl. ¶ 12. Detective Joseph Carrillo instructed Deputy Mark Carrillo to seize defendant's RAV-4 vehicle and drive it to the nearby LASD station. Id. Detective Joseph Carrillo indicated that the RAV-4 would be searched at the station given

the traffic on the freeway ramp. Id. Deputy Ortega then drove defendant to a nearby LASD station for booking while Deputy Mark Carrillo followed in defendant's seized RAV-4. Ortega Decl. ¶ 14; Carrillo Decl. ¶ 12. Defendant was read his Miranda rights at the LASD station and gave a voluntary statement to law enforcement in which he admitted that he had been dealing with this heroin trafficking organization for the past 14 years. Exhibit 1 to Neuman Decl.

## II.

## ARGUMENT

### A. The Investigatory Traffic Stop of Defendant Was Valid

The investigatory traffic stop in this case was undisputedly valid. As defendant concedes:

> based on what the investigative team of detectives and deputies knew and observed, they had reasonable suspicion supported by articulable facts that criminal activity [possible drug trafficking] may be afoot. Thus . . . they had a right to make an investigatory stop of defendant's vehicle.

Deft. Motion at 8 (quotation marks omitted). At the time of the traffic stop, law enforcement was engaged in a months-long investigation of a large-scale heroin distribution organization, had intercepted telephone conversations indicating that a heroin transaction was going to occur at a specific location, and had observed defendant and a known heroin trafficker conduct an apparent heroin transaction at that location while inside defendant's vehicle. Ortega Decl. ¶¶ 4, 5, 6. Based on these facts, it was highly probable that defendant would possess heroin on his person or in his vehicle. An investigatory stop does not violate the Fourth Amendment "if the officer has a reasonable

6

suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); United States v. Palos-Marquez, 2010 WL 157476, *2 (9th Cir. 2010) (same); United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) (same). Defendant concedes that such circumstances existed here. Deft. Motion at 8.

Yet, defendant apparently argues that evidence obtained through the investigatory stop should be suppressed because 1) prior to stopping defendant, the deputies observed defendant change lanes without signaling, giving them additional cause to conduct a traffic stop, and/or 2) the report of the incident does not explain the entire circumstances of the investigation in detail.[2] Deft. Motion at 3-6. Defendant provides no authority for either assertion and neither of these facts give rise to a Fourth Amendment violation which would justify suppression of evidence. First, there is no basis to conclude that subsequent traffic violations by a suspect somehow subvert the "reasonable suspicion" that justified a lawful investigatory stop prior to the traffic violations. Second, there is no basis to conclude that a lawful investigatory traffic stop is somehow rendered unlawful simply because the report regarding the stop does not

---

[2] Defendant incorrectly assumes that the report of the incident was written by Deputy Ortega, who conducted the investigatory traffic stop. Exhibit 1 to the Declaration of Ariel A. Neuman is the full report of this incident, which indicates that it was not written by Deputy Ortega, but by Detective Joseph Carrillo.

7

contain all facts known to the investigating agents.[3] Indeed, by way of analogy, a sworn affidavit in support of a criminal complaint or search warrant affidavit need not include all information in the government's possession; "only if the omitted facts cast doubt on the existence of probable cause" does a problem arise. United States v. Garza, 980 F.2d 546, 551 (9th Cir. 1992) (internal citations and quotations omitted); see also Fed. R. Crim. Proc. 3; United States v. Greenberg, 320 F.2d 467, 472 (9th Cir. 1963). Here, defendant wants the evidence suppressed because inculpatory facts were omitted from an unsworn police report. Suppression would be inappropriate as none of defendant's Fourth Amendment rights are implicated.

In short, defendant provides no authority to support the assertion that the investigatory traffic stop, for which he concedes there was proper basis, was not valid.

B. **The Safety Pat-Down of Defendant and Seizure of Heroin From Defendant's Person Were Lawful**

Defendant cannot dispute that Deputy Ortega's safety pat-down of defendant, a suspected heroin trafficker, was lawful. Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (safety pat-down

---

[3] Here, the facts surrounding the entire investigation are set forth in the report, albeit in broad terms. Read in the context of the entire report, it is clear that the investigatory traffic stop was part of an ongoing investigation by "GANET" and "HIDTA46 DEA" "regarding person(s) involved in the trafficking of heroin into the Los Angeles area;" that investigators "were surveilling a target of [the] investigation;" that they had "information" that this target "was meeting with a person identified as "Japo" at a specific location; and that the investigatory stop was initiated after defendant in fact met with the target inside defendant's vehicle at that location. See Exhibit 1 to Neuman Decl.

8

appropriate to allow "officer to pursue his investigation without fear of violence" if there is reason to believe suspect may have weapon) (citation omitted); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1086 (9th Cir. 2000) (Because police "reasonably suspected [the defendant] of dealing in narcotics," reasonable to believe he might be armed" and safety pat-down justified); see also Deft. Motion at 9-10. Further, as defendant concedes, when defendant stated that he had heroin in his vest pocket, defendant gave implied consent to the search of his vest pocket. See United States v. Todhunter, 297 F.3d 886, 891 (9th Cir. 2002) (finding voluntary implied consent to search where defendant pointed to areas where police would find firearms and drugs); United States v. Bertrand, 926 F.2d 838, 844 (9th Cir. 1991) (finding voluntary implied consent to search bag where defendant told officers his identification was in the bag); see also Deft. Motion at 5.

Whether Deputy Ortega actually smelled the distinctive, pungent odor of heroin that day is irrelevant. As defendant concedes, both the investigatory stop and the safety pat-down were lawful. Deputy Ortega knew, at the time of the traffic stop, that law enforcement was engaged in a months-long investigation of a large-scale heroin distribution organization, had intercepted telephone conversations indicating that a heroin transaction was going to occur at a specific location, and had observed defendant and a known heroin trafficker conduct an apparent heroin transaction at that location while inside defendant's vehicle. Ortega ¶¶ 4, 5, 6. Thus, Deputy Ortega had probable cause to believe defendant was in possession of evidence

related to heroin trafficking, whether or not the odor of heroin was present.

Nonetheless, defendant questions Deputy Ortega's statement that he smelled the odor of heroin in an effort to attack Deputy Ortega's credibility. Defendant's argument is essentially: 1) "heroin has no odor," thus 2) Deputy Ortega could not have smelled heroin, thus 3) Deputy Ortega should not be believed when he says defendant admitted having heroin in his pocket.[4] Deft. Motion at 5-6. However, defendant's basic premise - that heroin has no odor - is factually incorrect. It is well established that Mexican black tar heroin, such as that seized from defendant, has a distinctive and noticeable odor similar to vinegar. See Ortega Decl. ¶¶ 3, 11 (heroin has a "distinctive vinegar-like odor"); Debets Decl. ¶¶ 3, 4 ("odor of black tar heroin is strong and distinctive"); Garza Decl. ¶¶ 4, 5 (black tar heroin "generally has a distinctive 'vinegar' or 'pickle-like' odor"); Sharpe Decl. ¶ 4 ("black tar heroin is very pungent and has a distinctive, recognizable odor"); Exhibit 2 to Neuman Decl., pages 444 ("Tar heroin has a noticeable chemical odor similar to vinegar") and 445 (onions used to mask smell of heroin). Indeed, the odor is such a distinctive and noticeable aspect of black tar heroin that "sham" heroin being

---

[4] Contrary to the assertion in his motion, defendant does not claim that he did not tell Deputy Ortega that he had heroin in his vest pocket. See generally Declaration of Glenn Ito. Accordingly, while defense counsel has apparently reached that conclusion (Deft. Motion at 5), defendant himself does not so assert. The United States nonetheless addresses the issue because defendant's motion claims that no such exchange took place.

10

sold by undercover law enforcement officers is dipped in vinegar to fool heroin traffickers (Debets Decl. ¶ 5), and law enforcement chemists take the odor as an initial indicator that a sample to be analyzed is in fact heroin (Garza Decl. ¶ 4). The odor is strong enough that heroin can be smelled through balloons, plastic wrap, and other packaging material, even when hidden behind car dashboards or under seats. Debets Dec. ¶ 4; Garza Decl. ¶ 4; Sharpe Decl. ¶ 5. These facts have long been noted by courts. See, e.g., Washington v. McDonald, 2009 WL 2043058, *3-4 (E.D. Cal. 2009) (empty syringe concealed between car seats projected strong odor of heroin); United States v. Montes-Reyes, 547 F. Supp. 2d 281, 284 (S.D.N.Y. 2008) (officers recognized "strong odor" as "consistent with heroin"); United States v. Lugo, 170 F.3d 996, 1000 (10th Cir. 1999) (officer smelled black tar heroin from concealed compartment in vehicle); United States v. Uriostegui-Estrada, 86 F.3d 87, 89 (7th Cir. 1996) (heroin odor acknowledged by defendant); United States v. Sanchez-Lopez, 879 F.2d 541, 555 (9th Cir. 1989) (perfume used to mask smell of heroin); United States v. $124,570 U.S. Currency, 873 F.2d 1240, 1242 (9th Cir. 1989) (narcotics dog used to test for odor of heroin); United States v. Carrillo-Espinola, 1989 WL 140650, *1 (9th Cir. 1989) (heroin had "distinctive vinegar smell"); United States v. Hall, 543 F.2d 1229, 1231 (9th Cir. 1976) (based on seven years experience, officer recognized "strong acetic acid smell" coming from purse as heroin); United States v. Gonzalez, 700 F.2d 196, 204 (5th Cir. 1976) ("strong odor" in car was heroin); United States v. Leverette, 503 F.2d 269, 270 (9th Cir. 1974) (smell of heroin drew Custom Inspector's

11

attention); Brett v. United States, 412 F.2d 401, 404 (5th Cir. 1969) (mailed letters "bore the acid smell characteristic of Mexican heroin"); Moody v. United States, 376 F.2d 525, 529 (9th Cir. 1967) (smell of heroin familiar to officer).

Accordingly, Deputy Ortega's statement that he smelled the odor of heroin coming from defendant's vehicle is well-supported, and the attack on his credibility is a red herring at best. The United States submits that defendant's version of what happened that day - demonstrably incorrect based on his description of a safety pat-down that does not match basic LASD procedure (compare Ito Decl. ¶ 10 and Ortega Decl. ¶ 12; Carrillo Decl. ¶ 10) and a vehicle search that never happened - may be colored by the fact that he is a "long time" heroin addict (Ito Decl. ¶ 3) who now faces a mandatory sentence of ten-years in prison if convicted in this case.

C.  **The Results of the Search Were Subject to Inevitable Discovery**

Even accepting arguendo defendant's contention that defendant did not point Deputy Ortega to the heroin in defendant's pocket, the seized heroin would inevitably have been discovered in this case, and the subsequent Mirandized interview would have occurred. Under the inevitable discovery doctrine, "even if evidence is initially obtained by unlawful government conduct, '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received.'" United States v.

12

Merriweather, 777 F.2d 503, 506 (9th Cir. 1985) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "The inevitable discovery doctrine [also] applies to fifth amendment violations." United States v. Martinez-Gallegos, 807 F.2d 868, 870 (9th Cir. 1987). The inevitable discovery doctrine ensures that the government will be placed "in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Nix, 467 U.S. at 442. Where the evidence would have been discovered through the use of further "routine procedures," the doctrine applies. United States v. Boatwright, 822 F.2d 862, 865 (9th Cir. 1987) (citing United States v. Andrade, 784 F.2d 1431 (9th Cir. 1986) (evidence admissible because lawful inventory search likely) and Martinez-Gallegos, 807 F.2d 868 (evidence admissible because lawful examination of files likely)).

Here, defendant had been intercepted on wiretaps setting up drug deals with known heroin traffickers, and law enforcement officers then confirmed defendant's identity when they observed him engage in a suspected narcotics transaction exactly where and when he had arranged on the telephone. Accordingly, there was probable cause at the time of the investigatory stop to arrest defendant for a number of violations, including 21 U.S.C. § 846: conspiracy to distribute heroin, and 21 U.S.C. § 843(b): use of an interstate communication facility in committing a felony drug offense.[5] While Deputy Ortega may not have known all the details

---

[5] Defendant's comparison of the instant case to Sibron v. New York, 392 U.S. 40 (1968) is misplaced. Deft. Motion at 9. There, the arresting officer merely saw the defendant talking to

13

of those calls, such knowledge would not have been necessary to allow Deputy Ortega to lawfully arrest defendant based on the collective knowledge of the GANET and DEA agents involved in the investigation. United States v. Bertrand, 926 F.2d 838, 844 (9th Cir. 1991) (arresting officer need not have personal knowledge of facts indicating probable cause, but may rely on collective knowledge of other officers involved in the case). Here, the lead detective, Joseph Carrillo, who was familiar with all of the facts of the investigation, was watching from across the street, was in radio contact with the deputies, and could have directed the arrest. Ortega Decl. ¶ 14; Carrillo Decl. ¶ 12.

Further, there was probable cause to arrest defendant for the traffic violations observed by Deputies Ortega and Carrillo. Virginia v. Moore, 128 S.Ct. 1598, 1604 (2008) (officer who "has probable cause to believe a person committed even a minor crime in his presence" may constitutionally arrest that person).

Once arrested, defendant would have been lawfully searched incident to arrest and the heroin would have been discovered. Ortega Decl. ¶ 16; Moore, 128 S.Ct. at 1607-1608; United States v. Robinson, 414 U.S. 218, 235 (1973) ("[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but

---

a number of known narcotics addicts over a period of eight hours, did not see anything pass between the defendant and the addicts, and was not acquainted with and had no information about the defendant. Sibron, 392 U.S. at 62-63. Here, defendant had been intercepted arranging narcotics transactions on the telephone and had been observed engaged in an apparent narcotics transactions at the very time and place designated during those telephone conversations.

14

is also a 'reasonable' search under that Amendment."). Accordingly, the heroin seized and the subsequent <u>Mirandized</u> interview are not subject to exclusion.

## III.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress should be denied in its entirety without an evidentiary hearing.

Dated: February 12, 2010

GEORGE S. CARDONA
Acting United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

_/s/_
ARIEL A. NEUMAN
JUSTIN RHOADES
JEFF MITCHELL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA