Bernard J. Rosen/S.B. No. 41538
Beverly Hills Law Building
424 S. Beverly Drive
Beverly Hills, CA 90212
Tel:  (310) 203-9600
Fax: (310) 203-9696
e-mail: bernardrosenlaw@aol.com

Attorney for Defendant
GLENN ITO

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-230-SVW-44 |
| Plaintiff, | **Reply of Defendant Glenn Ito to Government's Opposition to His Motion to Suppress Evidence.** |
| v. | |
| RAMON MENDOZA, et al, | **FRCP 12(b)(3)(C), 47** |
| Defendants. | Date: March 17, 2010<br>Court: 6 |

Defendant Glenn Ito, by and through his counsel, Bernard J. Rosen, hereby files his Reply to the Government's Opposition to His Motion to Suppress Evidence.

Dated: February 19, 2010,    Respectfully submitted,

s// Bernard J. Rosen
BERNARD J. ROSEN
Attorney for Defendant
GLENN ITO

ARGUMENT

Defendant Ito has filed a motion to suppress evidence of heroin found on his person ("Motion") on the ground that the search of his person resulting in its discovery was illegal in that it occurred without a warrant and without probable cause. (Motion, at 1-2.)

The government has filed its Opposition to that motion ("Opp") in which it has argued that: a.) the investigatory traffic stop of defendant was valid (*id.*, at 6-8), b.) the safety pat-down of the defendant and the seizure of heroin from defendant's person were lawful (*id.*, at 8-12), and, in any event, c.) the results of the search were subject to inevitable discovery. (*Id.*, at 12-15.) Like Shakespeare's "lady" who "doth protest too much" (Hamlet Act 3, scene 2), the government's Opposition, it is respectfully submitted, doth admit too much, or so it appears.

The government states, at one point, that "[w]hether Deputy Ortega actually smelled the distinctive odor of heroin that day is irrelevant." (Opp, at 9.) It is not! If Deputy Ortega did not "actually" smell an odor of heroin, as it is written in the arrest report that he did, he has lied and/or the Sheriff's detective who claimed he said that lied.[1] But if one or more of the deputies lied about so crucial a fact, how is the Court to determine when they are not lying?

Of course, the government fully appreciates that "[w]hether Deputy Ortega actually smelled the distinctive odor of heroin that day is" relevant, indeed highly relevant. Why else has the government consumed almost three pages of its argument, with citations to numerous purported

---

[1] The government's Opposition incorrectly assumes that the defendant "incorrectly assume[d]" that the report of the incident was written by Deputy Ortega. (Opp, at 7, fn. 2.) *Au contraire,* the report is quite clearly "by dep J. Carrillo," who is, quite clearly, not "Deputy Ortega [who] could smell the odor of heroin …." The defendant (rather, of course, his counsel) simply assumed that each deputy's story would "back up" the other's; if not, Deputy Ortega is provided, if deemed necessary, "deniability."

authorities (*id.*, 10-12), if not to convince the Court that heroin does, indeed, have a distinctive odor? The only purpose served by all of that is to convince the Court that Deputy Ortega could have smelled heroin, therefore, he did, as reported, smell heroin, and therefore, he, and his fellow deputies, are, indeed, telling the truth! Indeed, in its efforts to convince the Court that that is so, the government has obtained the opinions of three persons[2] to give their "expert" opinion that, in the words of "police service dog handler" Stephen Sharpe, "the odor [of black tar heroin] is detectable by both humans and dogs." (Declaration of Stephen Sharpe, ¶ 4.)

But careful analysis of the governments arguments and declarations offered to justify the search for heroin on defendant Ito's person contain, it is submitted, reason to believe that they are not credible! In no particular order:

If, for instance, the odor of heroin is so "pungent," indeed, "very pungent … distinctive, [and] recognizable," (*ibid.*), that it is "detectable by both humans and dogs," why, a cynic might ask, do so many police departments feel the need to waste the time, effort, and money to train dogs to do what humans seem equally capable of doing?

And even if there are circumstances under which a vinegar-like odor can be associated with heroin (Declaration of Jaime Ortega ["Ortega"], ¶ 3; and see, Declaration of Joseph M. Klein, attached to defendant's motion, ¶ 10), it is a "stretch," it is submitted, to suggest that humans can smell a "vinegar-like odor of heroin coming from [a] vehicle" (Ortega, ¶ 11) when the heroin is packaged in balloons, contained inside plastic baggies, which are in a coat pocket. Vinegar certainly has a pungent odor – when the

---

[2] The defendant, having been found to be indigent and, therefore, eligible for the appointment of counsel, is limited in the number of experts he can consult with by reason of his need to obtain prior approval before seeking to consult with expert[s].

bottle is open and placed near one's nose; it has no such odor when the bottle is closed – which, of course, probably explains why police departments take the time, effort, and money to train dogs to find heroin![3]

It also appears that the deputies are changing, somewhat, the scenario that supposedly led to the finding of the contraband on the defendant's person. According to the original report, Ortega supposedly "could smell the odor of heroin coming from S/Ito's person" (Declaration of Ariel A. Neuman ["Neuman"], Ex. 1, at 3) and, then, "asked [him] if he had heroin on his person," with nothing being reported about a "safety pat-down" and/or the feeling of any "bulges." (Ortega, ¶ 13.) Thirteen months after-the-fact, Deputy Ortega now remembers a "safety pat-down" and feeling "a bulge in his vest pocket which felt like a beanbag" (*ibid*.) and it was the feeling of the bulge that led him to ask, "again," whether defendant possessed anything illegal.

The change in recollection, it is submitted, is noteworthy for a second reason: now standing within inches of the pocket containing the packets of balloons containing the pungent, distinctive, vinegar-like smelling heroin, Ortega, if his declaration is to be believed, no longer seems to smell it "coming from S/Ito's person"! (Neuman, Ex. 1, at 3.) Or has he simply forgotten that he supposedly once did?

This apparent inconsistency in recollection, it is submitted, is readily explainable. In a sense the government is correct – this isn't really a case about "smelling" heroin, only, rather, the "smelly" cover story the deputies created, initially, and the predicament they find themselves in, today, having been called on it. They could have chosen to abandon it in

---

[3] And why persons entering markets to purchase vinegar must still find the shelf on which such products are displayed by sight, rather than merely finding the product by following its "distinctive odor" upon entering such an establishment, or so defendant's counsel, and persons he knows, must do.

its entirety and state what really happened; instead, they appear to have attempted to "bridge the gap" by trying to repeat as much of it as they may believe they must in order to avoid having to answer why they created a cover story in the first place! And this should be obvious from what we now know they do admit.

As Ortega' declaration, and that of his partner Deputy Mark Carrillo ("M Carrillo"), clearly establish, they weren't on routine traffic or patrol duty that day. In absolutely identical language they swear that they were assisting Sheriff's Department and Drug Enforcement Administration personnel in the investigation of the "Mendoza Family heroin distribution organization" and that their assignment was to "monitor radio transmissions from other deputies and detectives and, *if directed*, conduct traffic stops of individuals identified as heroin traffickers." (Ortega, ¶4; M Carrillo, ¶ 3; emphasis added.)

Of course they were! Indeed, as indicated, the government ultimately contends that "there was probable cause at the time of the investigatory stop to arrest defendant for a number of violations …." (Opp, at 13.) Of course, there was – if, IF, there is reason to give credence to anything else those deputies allege.

But if there was probable cause to *arrest* for "conspiracy to distribute heroin" (*ibid*.), why was there, and is there still, such an effort to create what can only be described as a "cover story," *i.e.*, the defendant was only stopped because he was making lane changes "without signaling." (Ortega, ¶¶ 7, 9; M Carrillo, ¶¶ 6, 8.) But for the "odor" of heroin supposedly emanating from the vehicle and, maybe, his person, is the Court to believe that once ticketed for the "illegal lane change" the deputies would have let defendant Ito continue on with his journey? But continuing with the cover story seems to be of great importance. Why?

5

But there is one more thing, it is submitted, that should weigh heavily on this Court's concern about whether it is being told the truth when Deputy Ortega claims this was all about "smell[ing] and recogniz[ing] the distinctive vinegar-like odor of heroin coming from the vehicle." (Ortega, ¶ 11.) This incident does not stand alone. Indeed, it is alleged as merely one overt act – number 136 – of a conspiracy indictment alleging a total of 179 overt acts.

As the attached declaration of defendant's counsel represents, the discovery provided to the defense by the government in this case memorializes the discovery and seizure of heroin on at least 40 other occasions. In only 13 of those reports, all of which were written by one or more members of the Los Angeles County Sheriff's Department, is there an indication of an "odor" of heroin being smelled. Several of the reports which fail to mention "odor" involve quantities of heroin greater than that found on the defendant, many others involve a similar quantity.

The report relating to the offense alleged as the beginning of this conspiracy, overt act 1, reports the finding of 669 balloons of heroin in plastic baggies found in a shoe box in the closet of a house as well as other contraband, including other containers of heroin, in that closet. No mention of any odors appears in the report.

The report relating to the offense alleged as overt act 3 reports the finding of 89 balloons of heroin in three plastic baggies tucked into the waistband of a person stopped for a purported traffic violation. There is no mention of the words "odor" or "smells" -- from the vehicle, the person, at all!

The report relating to the offense alleged as overt act 6 reports the finding of 72 balloons of heroin in a plastic baggie supposedly "protruding from in between the front seats" of a vehicle stopped merely

for a traffic violation and observed, there, by the partner deputy, not the one engaging in conversation with the driver. It's a good thing he observed it because, apparently, no odor was emanating – none, at least, worth mentioning in the report.

The report relating to the offense alleged as overt act 16 reports the finding of 120 balloons of heroin contained in 5 plastic baggies. Where were they found? -- on the body of a person also stopped for a traffic violation. Where on his body? – stuffed into the crotch area of his pants. Was there an odor that led the deputies to look there? Apparently not; the report states only that the driver was observed placing his hands into his crotch area as if attempting to conceal something.

The report relating to the offense alleged as overt act 17 reports the finding of three baggies in a vehicle stopped for a traffic violation. The baggies contained a total of 64 balloons of heroin. Two baggies with 40 balloons were found under the front console of the vehicle, one baggie with 24 balloons behind the rear seat. There is no mention of any "odor."

The report relating to the offense alleged as overt act 56 reports the finding of 48 balloons of heroin in two plastic baggies found inside the gas tank door of a vehicle. No mention of any "odor" is made in the report; the arrestee was supposedly observed placing the baggies inside the door as deputies approached.

The report relating to the offense alleged as overt act 60 reports the finding of 24 balloons of heroin in a plastic film container seen thrown on the floor by a driver stopped for a traffic offense. There is no mention of any odor; the deputy supposedly knew the driver as a parolee and asked him what was in the container.

The report relating to the offense alleged as overt act 64 reports the finding of "a large ball size object wrapped in brown paper." The object

was found hidden behind the center console stereo area and was determined to contain approximately 50 grams of heroin. No odor is mentioned; the search of the vehicle was simply an "inventory" search upon the driver being arrested for failing to posses a drivers license.

The report relating to the offense alleged as overt act 66 reports the finding of 960 balloons (!) of heroin in 20 baggies inside a paper bag wrapped in a wet paper towel which package was found in the engine compartment of a vehicle being surveilled by narcotics investigators. In the course of the three page typed report memorializing the surveillance of the suspects, the stopping of their vehicle, and the finding of the package of heroin, the Sheriff's detective who prepared the report felt it was important to note that the paper towel was "blue" in color as well as "wet" and that the paper bag was "brown" and "torn." There is no mention of any odor emanating from the package – or any of its 960 (!) balloons.

The report relating to the offense alleged as overt act 69 reports the finding of 360 balloons of heroin in a vehicle. This arrest, according to that report, also involved surveillance of a vehicle by the narcotics investigation team. This vehicle stop did involve an odor – "a strong odor of fresh marijuana." It was eventually determined to be coming from "inside a 6 oz. can of 'Pringles' chips" which contained "marijuana particles and was emitting a strong odor of marijuana." Also found in the vehicle? – an unknown amount of currency found inside a "Country Time" lemonade container, and 360 balloons of heroin inside a can marked "Purina One" cat food. The report makes no mention of an odor from the Purina One cat food can.

The report relating to the offense alleged as overt act 73 reports the finding of 552 balloons of heroin by the narcotics investigation team. The

552 balloons were found in two "stash" cans inside a paper bag which was resting on the lap of the arrestee who was seated in the passenger side of a vehicle. Apparently there was no odor emanating from the bag or the cans; none is mentioned. The report reflects, rather, that the arrestee simply confessed what was inside once the deputies had approached him.

The report relating to the offense alleged as overt act 107 reports the finding of 48 balloons of heroin in two plastic baggies. One of the baggies was found in the arrestee's right front pants pocket; the other under the front seat of his vehicle. The report states that deputies were first directed to detain the arrestee by the narcotics investigation team and that they did so as he was walking towards an apartment building. Although the report states that the first baggie was found on his person, apparently there was no odor emanating from it. The report claims that the deputies simply asked the arrestee for permission to search him and that he "consented to the search." After his arrest the deputies searched the vehicle he claimed was his and found the second baggie. The report makes no mention of an "odor" in the vehicle either.

The report relating to the offense alleged as overt act 118 reports the finding of 72 balloons of heroin in three plastic baggies. The report states that deputies were directed to detain the arrestee by the narcotics investigation team and that upon doing so saw that he was holding the baggies with the balloons in his hand. The report states that the deputies "immediately recognized the items as common packaging for heroin." Nothing is said about the deputies "recognizing" any odors emanating therefrom, "common" or otherwise.

Finally, the reports relating to the offenses alleged as overt acts 146 and 149 report the finding of 96 balloons and 263 balloons, respectively, of heroin. The first lot found in a paper bag hidden inside the gas tank door

of a vehicle; the second in a cosmetic bag found in the trunk of a vehicle. Neither report mentions the sensing of any odors.

There are other reports relating to the discovery of heroin in this case, about eight, which also fail to mention any odor of heroin; these, however, relate to lesser quantities than were found on defendant Ito. And, of course, as indicated above, there are approximately thirteen reports memorializing the claim of one or more deputies that an "odor" of heroin was recognized. The point to be made from this review, it is submitted, is that the likelihood that a Los Angeles County Sheriff's deputy will claim to have "smelled the odor of heroin" is somewhat like flipping a coin – which may explain why Deputy Ortega's partner on the occasion of defendant's arrest, Deputy Mark Carrillo, while being similarly experienced (Ortega, ¶¶ 1-2; M Carrillo, ¶¶ 1-2), apparently chose to omit any claim of knowledge of, or ability to recognize, any "distinctive vinegar-like odor of heroin." (Ortega, ¶ 3.)

So we are back at square one: Who to believe? And what to believe?

And, it is submitted, the second of those rhetorical questions may be the most important. As argued above, *if* the deputies are to be believed, now, there was, as the government contends, probable cause to arrest defendant Ito because "defendant had been intercepted on wiretaps setting up drug deals … and law enforcement officers then confirmed defendant's identity when they observed him engage in a suspected narcotics transaction exactly where and when he had arranged on the telephone." (Opp, at 13.)

But how does the Court know that to be so – other than by the declarations of deputies Ortega (at ¶¶ 4-7) and Carrillo (at ¶¶ 3-6)? That isn't what was reported in the original report! (Neuman, Ex. 1, at 3.) That report merely alleged a surveillance of an investigation "target" and his

encounter with "S/Ito," (*ibid*.), followed by a traffic stop for supposedly changing lanes without signaling and the apparent fortuity of smelling "the odor of heroin coming from within the vehicle." (*Ibid*.)

The Court has been told two differing stories. The government and/or its agents apparently perceive a problem with sticking with the first, but also a problem with abandoning it altogether. So, or so it appears, a second story has been created to cover the first, *i.e.*, borrowing from the first one a little bit, so as not to appear to be abandoning it entirely, but adding elements to it that, in effect, replace it entirely. It's a neat trick; and could be a successful technique. Hopefully, the Court won't be deceived.

## Conclusion

The government's case for justifying the search of defendant Ito is based on two explanations, neither of which, it is submitted, appears entirely truthful. It being the government's burden to establish justification, its failure to provide an explanation that the Court can rely on as being entirely accurate amounts to, it is submitted, a failure of justification. Defendant's motion, therefore, ought to be granted.

Respectfully submitted,
/s/ Bernard J. Rosen
BERNARD J. ROSEN
Attorney for Defendant
GLENN ITO

## DECLARATION OF BERNARD J. ROSEN

I, Bernard J. Rosen, declare as follows:

1.  I am an attorney at law, a member in good standing of the bar of this Court, a member of the Federal Indigent Defense Panel, and appointed counsel for defendant Glenn Ito in the above-entitled case.

2.  As part of the discovery in this case provided by the government, I have received copies of forty reports memorializing the discovery and seizure of heroin, all of which reports were prepared by deputies of the Los Angeles County Sheriff's Department. Most of these reports, though not every one, relates to an incident that is alleged as an overt act to the conspiracy count alleged as count one in the Indictment before this Court.

3.  I represent that the summaries of the reports relating to overt acts 1, 3, 6, 16, 17, 56, 60, 64, 66, 69, 73, 107, 118, 146, and 149 which appear at pages six through ten of defendant's Reply to the government's Opposition to his Motion to Suppress Evidence accurately summarize the quantities of heroin reportedly discovered in each incident, the manner of discovery, and the omission of any mention of an "odor" purportedly related to the heroin discovered.

I declare under penalty of perjury that all of the above is true.

Executed this 19th day of February, 2010, at Beverly Hills, California.


        /s/ Bernard J. Rosen
        BERNARD J. ROSEN